WILCOX *v.* HUBBELL.

1. TRUSTS—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

On a bill by the beneficiaries of a trust agreement against the administrator of the intestate's estate and the trustee under the agreement, evidence *held*, insufficient to show undue influence upon decedent at the time of execution of such agreement.

2. SAME—WITNESSES—COMPETENCY—STATUTES.

On a bill by the beneficiaries under a certain trust agreement executed by a decedent against the administrator of the decedent's estate and the trustee to enforce the agreement, evidence *held*, sufficient to show that plaintiffs' mother was not an agent for either the decedent or the beneficiaries as to the agreement, and that the attorney was not an agent for any of them, so as to render both competent to testify on behalf of plaintiffs as to the agreement, under 3 Comp. Laws, § 10212, as amended by

Act No. 230, Pub. Acts 1901 (3 Comp. Laws 1915, § 12553), relating to transactions with deceased persons.

3. SAME—MENTAL COMPETENCY—EVIDENCE.
On a bill by the beneficiaries of a trust agreement against the administrator of the estate of the decedent and the trustee, evidence *held*, sufficient to show that decedent was mentally competent to execute the agreement at the time of the execution thereof.

4. SAME—INTENTION OF PARTIES—CARRYING INTO EFFECT.
The intention of a testator in relation to a trust agreement should be carried into effect if it can be done without doing violence to established rules.

5. SAME—TRUST DEEDS—WILLS—REVOCATION OF INSTRUMENT— EFFECT AS WILL.
Where a decedent by a trust deed assigned certain of his property to the designated trustee in trust to invest same and pay the income therefrom to decedent for life and at his death the income on hand to his heirs, or as his will might direct, and the principal estate to designated beneficiaries, and the agreement provided that such disposition of the principal estate at the death of the decedent might be changed by mutual instrument .by the decedent and the trustee within two years after the execution of said trust agreement, the rights of the beneficiaries accrued at the time of the execution and delivery of the trust agreement, except as it contained a limited right of revocation, and consequently the deed of trust was not testamentary, since a power of revocation in a deed of trust does not render it testamentary.

Appeal from Kent; Perkins, J.   Submitted January 3, 1917.   (Docket No. 12.)   Decided June 27, 1917.

Bill by Raymond H. Wilcox and others against George Hubbell, administrator of the estate of William Wilcox, deceased, and the Michigan Trust Company to enforce the performance of a trust agreement and for an accounting.   From a decree for plaintiffs, defendant Hubbell appeals.   Affirmed.

*Wilson & Johnson* and *Butterfield & Keeney,* for plaintiffs.

*Jewell & Smith (Warren, Shuster & Case,* of counsel), for appellant.

OSTRANDER, J.  William Wilcox, 83 years of age, and a bachelor, of Honeoye Falls, Monroe county, N. Y., a small village about 16 miles from Rochester, died December 22, 1912, at Honeoye Falls, intestate. His sister, Lorinda Kendall, George Hubbell, son of a deceased sister, Susan Richards, a daughter of another deceased sister, Raymond H., Sanford P., Louise M., Robert C., and Marion Wilcox, of Grand Rapids, Mich., children of Frederick P. Wilcox, a nephew of the deceased, survived him.  Robert C. and Marion Wilcox are infants, represented by their mother as next friend.  On the 30th day of October, 1912, William Wilcox, by an instrument executed in the county of Monroe, in the State of New York, duly acknowledged on the same day before a notary public for that county, sold and assigned, transferred and set over to the Michigan Trust Company, of Grand Rapids, 86 mortgages, described in said instrument, together with the notes, bonds, or other obligations to which the mortgages were collateral.  On the same date he executed another instrument, to which he and the Michigan Trust Company, of Grand Rapids, are parties, which excepting the acknowledgments thereto, is here set out:

"This agreement made this 30th day of October, 1912, in duplicate, by and between William Wilcox, of Honeoye Falls, Monroe County, N. Y., and the Michigan Trust Company of Grand Rapids, Mich., hereinafter called the trustee, witnesseth:

"(1)  Said Wilcox has a number of notes secured by mortgages on real estate in Kent county, Mich., and he desires to be relieved of the same.  He has this day assigned all of said notes and mortgages to said trustee, and he may from time to time place in the hands of said trustee moneys and other property, all of said notes, mortgages, moneys, and other property

to be held by the said trustee in accordance with the terms of this instrument.

"(2) Said trustee shall manage and control all of the property turned over to it under this agreement in such manner as it shall deem best. It shall have the right to invest and reinvest the principal of all moneys coming into its hands under this agreement in interest-bearing or income-producing notes, mortgages, bonds, or other securities. It shall have the right to sell and assign all or any part of the properties now or hereafter embraced in this trust, at such times and at such prices and upon such terms as said trustee may deem to be for the best interest of the trust. It shall have the right to take all legal steps and institute and conduct all suits or legal proceedings, either in its own name or in the name of said Wilcox, which may be necessary or proper for the purpose of realizing on or collecting any sums which may be due on any of the securities embraced in this agreement. It shall have the right to pay all taxes and assessments which may be levied upon any property embraced in this agreement, as well as all taxes, assessments, and insurance premiums upon properties covered by real estate mortgages and which the trustee may deem it necessary or proper to pay in order to protect the interests of the trust. Said trustee shall have the right to make such other and further disbursements as in the judgment of said trustee may be necessary or suitable for the proper care and management of the property embraced in this trust. The trustee is authorized to make such disbursements out of the funds belonging to this trust or to advance moneys therefor if it deem it best so to do, such advances to be refunded to said trustee out of said trust property.

"(3) Said trustee shall be held to no obligation under this agreement, save the exercise of good faith and ordinary diligence in the discharge of those duties which by the terms of this agreement it has undertaken.

"(4) The trustee shall keep a true account of all the affairs of the trust and shall on the 1st days of January and July in each year, or as soon thereafter as is reasonably practical, render to said Wilcox a statement of its receipts and disbursements as such trustee

during the six months preceding, keeping separate the principal of the trust fund from the income therefrom, and shall also render to the said Wilcox such a statement at any time whenever requested so to do.

"(5) The trustee shall receive for its services under this agreement one-half of 1 per cent. per annum of the principal of said trust fund, to be paid semi-annually from the income from said trust fund. If the principal of the trust fund is increased by additions thereto made by said Wilcox, or in any other manner, the trustee's fees shall be increased proportionately. The trustee shall also deduct from said income all reasonable expenses or charges of whatsoever kind or nature, including attorney and counsel fees, to which said trustee shall be put in the performance of the trust or obligations created by this agreement, or by reason of its connection with the properties embraced in this agreement, or the management or discharge thereof.

"(6) The net income from the trust fund in the hands of said trustee under this agreement, after payment of its fees and expenses, shall be paid to the said Wilcox from time to time in such amounts as he may request. Should the said Wilcox not use all the said income, he may from time to time direct the said trustee to transfer any part of such accumulated income to the principal of the trust created by said instrument, and the same shall thereupon and thereafter be in all respects a part of the principal of the trust fund and be subject to all the provisions of this instrument governing such principal.

"(7) The trust created by this instrument shall terminate upon the death of the said Wilcox. All moneys then in the hands of said trustee from the income of the trust created by this instrument shall, after the payment of the trustee's fees and expenses as hereinbefore provided, be paid by the said trustee as the said Wilcox may by his will direct, or in default of such will to his heirs at law. The principal of said trust fund, including all properties and rights of every name and nature, shall, upon the death of the said Wilcox be transferred and delivered by the said trustee as follows, viz.: To the children of his late nephew, Frederick P. Wilcox, Louise M. Wilcox, Raymond H.

Wilcox, Sanford P. Wilcox, Robert C. Wilcox, and Marion Wilcox, in equal shares, share and share alike.

"It is agreed that said William Wilcox and said trustee may at any time within two years from date, by mutual instrument, executed with the same formalities and in the same manner as this instrument is executed, provide for a different disposition at the termination of said trust of the property constituting the principal of the trust fund hereby created.

(Copy)
(M. T. Co.)
(Seal)

In witness whereof, the said William Wilcox has hereunto set his hand and seal and the said trustee has caused these presents to be executed by its proper officers and its corporate seal to be hereto affixed the day and year first above written.

WILLIAM WILCOX.        (Seal.)

THE MICHIGAN TRUST COMPANY,
By LEWIS H. WITHEY,
President.
and GEORGE HEFFERAN,
Secretary.

Signed, sealed and delivered in presence of
HORACE J. TUTTLE,
as to William Wilcox.
HENRY W. HALL,
as to William Wilcox.
JOHN H. SCHOUTEN,
ELSIE E. WURZBURG,
as to M. T. Co."

Mr. Hubbell, having been appointed administrator of the estate of William Wilcox, gave notice to the Michigan Trust Company that he claimed that the assignment of mortgages and the trust agreement were invalid and directing the Michigan Trust Company not to carry out or not to further carry out the said trust agreement.

Plaintiffs, who are the beneficiaries under the said trust agreement, thereupon filed the bill of complaint in this cause, attaching a copy of the trust agreement and of the assignment of mortgages, setting up sub-

stantially the facts herein already stated, claiming that upon the death of the said William Wilcox they became immediately entitled to the principal of the trust fund and had requested the Michigan Trust Company to transfer and deliver the fund accordingly, and that the request had been declined on account of the notice given by the said George Hubbell, administrator of the estate of William Wilcox. Plaintiffs pray that they be decreed to be the owners of the trust fund in the hands of the Michigan Trust Company by virtue of the said trust agreement, and may have an accounting and a delivery over to them of the fund. George Hubbell, administrator, etc., and the Michigan Trust Company are made parties defendant.

The trust company filed a formal answer, submitting itself to the direction of the court. The administrator alleges that the assignment of the securities was procured by undue influence, fraud, and deceit practiced upon William Wilcox by the mother of plaintiffs and by other persons unknown to defendant, that the deceased, Wilcox, was at the time of the alleged execution of the assignment mentally incompetent to execute it, and he denies that said Wilcox knowingly entered into an agreement in writing with the Michigan Trust Company with reference to the notes and bonds and mortgages, and alleges upon information and belief that, if the said trust agreement was signed by him, his signature was obtained by undue influence, fraud, and deceit practiced by Caroline B. Wilcox and by other persons, and that he was mentally incompetent to execute that agreement.

The legal effect of the instrument claimed by the plaintiffs is denied by the answer, and the defendant therein asks for affirmative relief and for a decree that the alleged assignment and trust agreement are null and void, that the defendant as administrator be

adjudged to be entitled to all moneys and properties in the hands and possession of the Michigan Trust Company as an alleged trustee, to whom an accounting must be made by the said Michigan Trust Company, and that, if the court find the said assignment and trust agreement to have been in fact executed by said William Wilcox while of sound mind and memory and under no restraint or undue influence, it be decreed that the trust created was immediately terminated by the death of the said William Wilcox, and thereafter no duty remained for the said Michigan Trust Company to perform except to make accounting to the legal representative of the deceased.

The court below took up the hearing of this cause December 1, 1914. The proofs were closed January 30, 1915, and on the 8th day of October, 1915, the cause having been in the meantime argued by counsel and considered by the court, a decree was entered agreeably with the prayer of the plaintiffs' bill.

It is contended by the defendant administrator, appellant, that:

(1) Construed in the light of the facts, even though it was competently and freely made, the agreement presented as a trust agreement is invalid as a trust agreement because it was executed "without the intention necessary to a valid trust agreement."

(2) Considered as a legal instrument, without regard to the facts, the trust agreement is invalid as a matter of law.

(3) As a matter of both fact and law William Wilcox was not mentally competent to execute the agreement, and it was not made with freedom from undue influence.

(4) Mrs. Wilcox, mother of plaintiffs, and Mr. Tuttle, a lawyer, a witness to the instruments, were not competent witnesses to the making of the trust agreement.

It will be noted that the third contention stated is double, in that it asserts lack of mental competency

and undue influence. Undoubtedly a person mentally incompetent may be subject to influences which would not affect, could not affect, a person mentally competent. It would depend somewhat upon the nature of the incompetence and somewhat upon the influence exerted. But it is true, in a general way, that influence which no one would suppose could influence a person of strong mentality may affect improperly weak minds. In this case, however, the charge made in the argument that Mrs. Caroline Wilcox, the mother of the plaintiffs, and Horace J. Tuttle, the attorney at Rochester, were guilty of procuring the execution of these two instruments under circumstances which amounted to the practice of deceit, may be disposed of now without setting out here the testimony relied upon to prove fraud and deceit (and it must have been practiced by the two persons named, if by any one). It is sufficient to say, I think, that after a careful reading of the testimony I am unable to find any which tends to prove either Mrs. Wilcox or Mr. Tuttle intended at any time or for any purpose to impose upon or deceive William Wilcox, or improperly to influence him to execute either of the instruments which he did execute and which are in question here. A question wholly independent from this is the one whether William Wilcox intelligently executed the assignment and the trust agreement. But I find nothing which tends to prove that in his conduct or his apparent intelligence Mr. William Wilcox gave notice or intimation to either Mrs. Wilcox or to Mr. Tuttle that he did not appreciate the terms and conditions of the instruments which he executed, as well as their legal effect.

The fourth contention of appellant must be overruled. Mrs. Wilcox was a witness for the plaintiffs and after her examination had proceeded for a time objection was made that she was testifying to matters

which were equally within the knowledge of William Wilcox. It is claimed that in what she did with reference to the trust agreement she was acting as agent for her children, for which reason her testimony was barred by the provisions of section 10212, 3 Comp. Laws, as amended by Act No. 239, Pub. Acts 1901 (5 How. Stat. [2d Ed.] § 12856, 3 Comp. Laws 1915, § 12553). A similar objection was made to a part of Mr. Tuttle's testimony upon the ground that he was either acting as agent for the plaintiffs or acting on behalf of Mrs. Wilcox, who was their agent. In essence, this contention rests upon the truth or falsity of the charge that Mrs. Wilcox was seeking an advantage for her children and active in procuring such an advantage in whatever she said to William Wilcox before the instruments in question were executed. If, as I am satisfied is true, she had no intention or purpose of seeking from William Wilcox any advantage for her children, there is nothing to support the proposition that she was agent for her children. If she was not an agent for her children within the meaning of the statute, then the objection to the testimony of Mr. Tuttle is without any force.

It is well to have the facts in mind. By one of the instruments in question William Wilcox assigned certain notes and mortgages to the Michigan Trust Company; by the other he created a trust, of which the Michigan Trust Company was trustee, and of which he and the children of Mrs. Wilcox were beneficiaries. It appears that Frederick P. Wilcox, husband of Caroline Wilcox, died July 15, 1912. He for a long time had done business for William Wilcox in Michigan, apparently to his satisfaction and profit. On July 22, 1912, Mrs. Wilcox wrote William Wilcox, telling him of her husband's death, and advising him that he must get some one to look after his business. By her husband's will the Michigan Trust Company had been

appointed guardian for her two minor children. She herself lived in Grand Rapids, and she suggested to William that he employ either the Michigan Trust Company or Mr. Tuttle, of Rochester, to look after his affairs. To this letter she had no reply, and in August, at her request, Mr. Tuttle saw William and told him that Mrs. Wilcox must be relieved and that he must select some one to look after his Michigan business. He decided to have the Michigan Trust Company do it, which decision Tuttle reported to Mrs. Wilcox. The Michigan Trust Company was advised and the trust agreement was prepared under its direction. There was no reference in this agreement as prepared to the plaintiffs, but there was a blank place for the insertion of names of beneficiaries. There is no testimony tending to prove that any of the plaintiffs knew anything about the preparation of the trust agreement. Mrs. Wilcox took it with her when she went to Rochester on business of her own and went to Honeoye Falls to see William. Instead of asking him to make her or her children beneficiaries, as he suggested he would like to do, she urged that he select others. She suggested that he give it to the hospitals of Rochester, or to some other charitable institution, and she left him without knowing what he was going to do, and did not know until she was told later by Mr. Tuttle that he had left his property to her children. There is no testimony in the record to dispute this. Mr. Tuttle had nothing to do with the preparation of the trust agreement, and did not know its terms until he went with Mrs. Wilcox to Honeoye Falls to see William Wilcox. As for his advice, Mr. Tuttle declined to advise him further than to let his property go to his heirs according to the laws of the State of New York, a suggestion which Mr. Wilcox flatly refused, and then Mr. Tuttle told him, "It is for you to figure out," and it was after that that Tuttle

was advised by William Wilcox to write into the trust agreement the names of the children of his deceased nephew, Frederick P. Wilcox.

I find in the circumstances and in the testimony on this subject nothing to support the conclusion that Mrs. Wilcox or Mr. Tuttle were agents for William Wilcox; that either was "a person who acted as an agent in the making or continuing of a contract with any person who may have died."

What is left of the third contention of the appellant is that William Wilcox was mentally incompetent to do what he did, namely, intelligently execute the assignment of the mortgages and the trust agreement. William Wilcox was a singular character. Witnesses were produced on the part of the plaintiffs and on the part of the defendant for the purpose of making for the court a representation or picture of the man William Wilcox, his associates, his habits, his apparent capabilities, and, as is usual, much of the testimony is negative, little or none of it that of persons who had actually made any real and continued observation of the man for the purpose of forming an opinion of his mental strength or weakness. Certain habits and peculiar things about him were known to a great many people. There is no real history of his early years. Apparently he had, in his later years at least, followed no occupation, engaged in no business. He did not acquire his fortune. He had at various times received money from certain estates, and this, or some of it, had been turned over and for about forty years cared for by his brother, Otis N. Wilcox, and after his death by Frederick P. Wilcox, a son of Otis, all without any charge to William. William had never drawn much of the money, and it had accumulated until there was some $70,000 invested in real estate mortgages in and around Grand Rapids. When Frederick P. died, then, as has been stated, his wife declined to

care for William's property. For a period of twenty years William Wilcox had resided with the Hubbell family in New York, and during that time he had never paid them anything for board. When Anna Hubbell, his sister, died, he went to live with his sister Mary Rich, and lived with her about five years, when she died. From time to time he stayed with the defendant George Hubbell, at his residence in Honeoye Falls, and was often there on holidays. In the spring of 1911 he was with Mr. Hubbell three or four weeks, then he went to Grand Rapids to the home of Frederick P. Wilcox and stayed there four or five weeks, when he returned to Mr. Hubbell's house and stayed there for three or four weeks. He was penurious, and witnesses testified that during the last two or three years of his life a change in his general appearance, demeanor, and intellectual strength was observed.

There is testimony that he had during the last year and a half of his life several "fainting spells." In one of them, about six months before he died, he was carried unconscious to his room. Lapses of memory were noticed by persons who knew him, and a recurrence by him in questions he asked to matters he had been informed about. He lived poorly, dressed poorly, spent no money. For twenty-five years he had dyed his hair and whiskers, and this he ceased to do. He pilfered small articles from the stores in the village where he lived, and picked up and saved or used articles of no value. He was found dead in his room in a hotel building in which business had ceased, which he had occupied for a considerable time, sitting in a chair, partly dressed. There was no fire in the room. He had on his person six purses, containing some $500 in paper money and $16 in silver money. In a valise, a "telescope," in his room, was a money belt containing about $1,500 in paper money, which appeared to have been

placed therein many years before. There was found also in various receptacles partly used pieces of soap, tobacco, cigars, neckties, candy, and a variety of useless, invaluable odds and ends. In the accumulation of this trash, in his dress, in his manner and habits of living, he was miserly. There is evidence of physical and mental decay, of exhibitions of childish weakness, and there are few men who pass the age of eighty years of whom such evidence cannot be given. But one need not be vigorous in body or in mind to handle and dispose of property. There is testimony which, if believed, leaves no doubt that this man had sufficient mental integrity to do understandingly what he did do. There is testimony, credible in itself, and in its source, sustaining the proposition that Wilcox did not mean to bestow his property otherwise than as he did. The testimony relating to the conduct of deceased in executing the instruments in question is convincing that he possessed the necessary intelligence. He knew that his nephew had cared for his fortune in Michigan; that he was dead; that his widow, although he greatly desired her to do so, refused to attempt the care of it. He had given the matter little attention, but was confronted with the necessity of choosing an agent. The attorney for the Michigan Trust Company prepared the instruments, leaving the trust agreement in such form that the names of the ultimate beneficiaries could be inserted. The form and terms of the trust agreement are those which the trust company suggested, and not terms suggested by any of the parties hereto or their agents or representatives. The trust company, if it did not insist upon, preferred the agreement which was prepared and executed.

Without attempting here to analyze the testimony, and limiting myself to a statement of conclusions, I find that William Wilcox was competent to make, and that he intelligently did make, the instruments in ques-

tion. This finding embraces the conclusion that they were executed with the intention imported by the terms of the instruments.

There is to be considered the second contention of the appellant, namely, that the trust agreement is in law invalid. It is said that, assuming that upon the face of the instrument it created a valid trust to receive and pay over to the settlor for his life the income of the mortgages, the purpose of the instrument is permitted by the law of New York; but, it is said, by the express terms of the instrument the trust was to terminate from the death of William Wilcox, and the disposition of the estate provided for in the seventh clause of the agreement cannot be sustained as made pursuant to a second trust, or a power in trust, or as a gift *inter vivos* or *causa mortis*, or a testamentary disposition of property.

Whether the trust agreement created a mere agency for the personal benefit and convenience of William Wilcox was a testamentary disposition of property, to take effect only after his death, and was therefore revocable at his pleasure, or whether, with the assignment and delivery of the fund, it created an executed express trust, or trusts, disposing irrevocably, except according to the condition of the principal of his estate to persons, who at once acquired a vested interest therein, is the serious question which is presented.

I have said that the instrument was executed with the intention imported by its terms, meaning that it was the purpose of William Wilcox to provide for doing just what has been done and what will be done if the principal of the estate is paid to the designated beneficiaries. This intention the courts should carry into effect if it can be done without doing violence to established rules. In *Frederick's Appeal*, 52 Pa. 338 (91 Am. Dec. 159), a somewhat similar and in some respects dissimilar instrument was considered, with the

conclusion that it was revocable in so far as before revocation it had not been carried into effect by the execution of the powers therein given to the so-called trustee. There are other similar cases. In *Wilson* v. *Anderson*, 186 Pa. 531 (40 Atl. 1096, 44 L. R. A. 542), the headnote of the reporter, fairly stating the conclusion of the court, reads as follows:

"If the intention of the grantor at the time he delivers a voluntary deed of trust is to part with the legal title, the trust will be enforced in favor of the beneficiaries, even though their enjoyment of the estate is postponed until the death of their benefactor. Equity, because of exceptional facts in rare cases, has revoked the trust or held it revocable by the grantor, because plainly a testamentary instrument; but the general rule has remained without change."

In the note "a," 1 Perry on Trusts (6th Ed.), p. 115, the author has collected and to some extent analyzed a considerable number of decisions, saying:

"There have been many cases of valid trusts which in practical effect were intended to be hardly more than dispositions of the property after the settlor's death. Thus cases are frequent where the owner of property has, without consideration, conveyed it to another to hold as trustee for the benefit and enjoyment of the settlor during his life, and on his death upon further trust for other beneficiaries or to pay over to designated persons. *Nichols* v. *Emery*, 109 Cal. 323 [41 Pac. 1089, 50 Am. St. Rep. 43]; *Lewis* v. *Curnutt*, 130 Iowa, 423 [106 N. W. 914]; *Brown* v. *Mercantile Trust Co.*, 87 Md. 377 [40 Atl. 256]; *Bromley* v. *Mitchell*, 155 Mass. 509 [30 N. E. 83]; *Kelley* v. *Snow*, 185 Mass. 288 [70 N. E. 89]; *New York Life Ins. & Trust Co.* v. *Livingston*, 133 N. Y. 125 [30 N. E. 724]; *Rynd* v. *Baker*, 193 Pa. 486 [44 Atl. 551]; *Wilson* v. *Anderson*, 186 Pa. 531 [40 Atl. 1096, 44 L. R. A. 542]; *Kraft* v. *Neuffer*, 202 Pa. 558 [52 Atl. 100]; *Fry* v. *Mercantile Trust Co.*, 207 Pa. 640 [57 Atl. 43]; *Brace* v. *Van Eps*, 12 S. D. 191 [80 N. W. 197], 13 S. D. 452 [83 N. W. 572]. See, also, *Durand* v. *Higgins*, 67 Kan. 110 [72 Pac. 567]."

"The essential difference between such a trust instrument and a will is that the former acts at once to vest the interests of the beneficiaries, although their enjoyment is postponed until after the death of the settlor, but a will does not take effect until the death of the testator, and until that time vests no interests in the beneficiaries."

In *Nichols* v. *Emery,* 109 Cal. 323, 329 *et seq.* (41 Pac. 1089, 1091, 50 Am. St. Rep. 43), is to be found the following statement of the controlling rules:

"It is undoubtedly the general rule enunciated by the leading case of *Habergham* v. *Vincent,* 2 Ves. Jr. 231, and oft repeated, that the true test of the character of an instrument is not the testator's realization that it is a will, but his intention to create a revocable disposition of his property to accrue and take effect only upon his death and passing no present interest.

"The essential characteristic of an instrument testamentary in its nature is that it operates only upon and by reason of the death of the maker. Up to that time it is ambulatory. By its execution the maker has parted with no rights and divested himself of no modicum of his estate, and *per contra* no rights have accrued to and no estate has vested in any other person. The death of the maker establishes for the first time the character of the instrument. It at once ceases to be ambulatory; it acquires a fixed status and operates as a conveyance of title. Its admission to probate is merely a judicial declaration of that status.

"Upon the other hand, to the creation of a valid express trust it is essential that some estate or interest should be conveyed to the trustee, and when the instrument creating the trust is other than a will, that estate or interest must pass immediately. 1 Perry on Trusts (6th Ed.), § 92. By such a trust, therefore, something of the settlor's estate, has passed from him and into the trustee for the benefit of the *cestui,* and this transfer of interest is a present one, and in no wise dependent upon the settlor's death. But it is important to note the distinction between the interest transferred and the enjoyment of that interest. The enjoyment of the *cestui* may be made to commence in the future and to depend for its commencement upon the termina-

tion of an existing life or lives or of an intermediate estate. Civ. Code, § 707.

"Did the grantor in the present case divest himself by the instrument of any part of the estate in the land which he had formerly owned and enjoyed? By the terms of the instrument an estate was assuredly conveyed to the trustee. The language is appropriate to a conveyance, and the grantor's execution and delivery of the deed (both found), he being under no disability, and impelled by no fraud, operated to vest so much of his estate in the trustee as was necessary to carry out the purpose of the trust. The especial purpose was to sell and distribute the proceeds upon his death—a legal purpose authorized by section 857 of the Civil Code. The term of the duration of the trust, the life of the settlor, did not violate the provisions of section 715 of the same Code. We have therefore an estate conveyed to a named trustee for named beneficiaries, for a legal purpose and a legal term, such a trust as conforms in all its essentials to the statutory requirements. That no disposition is made by the trust of the interest and estate intervening in time and enjoyment between the dates of the deed and the death of the settlor cannot affect the trust. The trustee takes the whole estate necessary for the purposes of the trust. All else remains in the grantor. Civ. Code, § 866. In this case there remained in the grantor the equivalent of a life estate during his own life, and he was thus entitled to remain in possession of the land, or lease it and retain the profits.

"Nor did the fact that the settlor reserved the power to revoke the trust operate to destroy it or change its character. He had the right to make the reservation (Civ. Code, § 2280), but the trust remained operative and absolute until the right was exercised in proper mode. *Stone* v. *Hackett*, 12 Gray (Mass.), 232; *Van Cott* v. *Prentice*, 104 N. Y. 45 [10 N. E. 257]. Indeed, this power of revocation was strongly favored in the case of voluntary settlements at common law, and such a trust without such a reservation was open to suspicion of undue advantage taken of the settlor. Lewin on Trusts, pp 75, 76; Perry on Trusts (6th Ed.), § 104."

See, also, *Seaman* v. *Harmon*, 192 Mass. 5 (78 N. E.

301) ; *Kelley* v. *Snow,* 185 Mass. 288 (70 N. E. 89) ;
*Kelly* v. *Parker,* 181 Ill. 49· (54 N. E. 615) ; *Brown* v.
*Spohr,* 87 App. Div. 522 (84 N. Y. Supp. 995) ; *Rynd*
v. *Baker,* 193 Pa. 486 (44 Atl. 551).

In the instrument before us there is an estate desig-
nated, a trustee named, a trust expressed, an owner of
the estate, who is settlor of the trust, designated bene-
ficiaries. The instrument recites the transfer of title
to the property by the settlor to the trustee. There are
persons who have an immediate right to the possession
of the property upon the ceasing of the precedent
estate—upon the death of the settlor. The power to
make a different designation of beneficiaries is re-
served, to be exercised with the consent of the trustee,
by a mutual instrument. It may be said that two
trusts are declared; the second not to take effect in
possession and enjoyment until the death of the settlor.
This is not because the instrument is testamentary in
character, but because the instrument in terms so de-
clares. The rights of the beneficiaries accrued at the
time of the execution and delivery of the instrument
and the property, except as the instrument contained
a limited right of revocation. A power of revocation
in a deed of trust does not render the instrument testa-
mentary. *Van Cott* v. *Prentice,* 104 N. Y. 45 (10 N.
E. 257) ; *Robb* v. *Washington and Jefferson College,*
185 N. Y. 485, 493 (78 N. E. 359).

It is said that by the terms of the instrument the
trust ended with the death of the settlor. This argu-
ment is based upon the language of paragraph 7. But
the trustee is to hold the property "in accordance with
the terms of this instrument," paragraph 1. The trust
declared in the paragraphs preceding 7 relates to the
acquiring, holding, investing of the fund, and paying
the income thereof. No other trust is declared. As I
interpret the instrument, the intention is plain to de-
clare a second trust, and it is declared in paragraph

7. The trust declared in that part of the instrument which precedes paragraph 7 does end, terminate, with the death of William Wilcox, leaving the trustee in possession of the fund, and it is declared that then the trustee shall dispose of the fund. It would be insensible, I think, to find in the language an intention to declare a trust terminating with the death of Mr. Wilcox.

In the instruments which were executed a valid trust was created, the testimony does not impeach the capacity of the settlor, or the honesty of those charged as influencing him improperly, and the decree below, which is in accordance with these views, must be affirmed, with costs to appellees.

KUHN, C. J., and STONE, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.